UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CARESPRING HEALTHCARE | : | Case No. 1:16-cv-1051 |
| MANAGEMENT, LLC, *et al.*, | : | |
| | : | Judge Timothy S. Black |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| CYNTHIA C. DUNGEY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (Doc. 23)
AND TERMINATING THIS CASE IN THIS COURT**

This civil action is before the Court on Defendants' motion to dismiss (Doc. 23)

and the parties' responsive memoranda (Docs. 25, 29).

## I. BACKGROUND

Under the Medicaid Act and implementing regulations, Medicaid recipients who

require long-term care in a nursing home facility are required to use some of their

monthly income to pay for the cost of care. The parties refer to this payment as "patient

monthly liability." An individual Medicaid recipient's patient monthly liability varies

based on their monthly income. Regulations promulgated by the Centers for Medicare &

Medicaid Services ("CMS") include instructions directed to state Medicaid authorities

specifying how the state must calculate patient monthly liability.

Plaintiffs Carespring Healthcare Management, LLC ("Carespring") and The Good

Shepherd Home for the Aged ("Good Shepherd") operate nursing homes in various

Southern Ohio locations. They have brought this suit against Defendants Cynthia C.

Dungey, the Director of the Ohio Department of Job and Family Services ("ODJFS"), and Barbara Sears, the Director of the Ohio Department of Medicaid ("ODM"), alleging that one or both of these entities improperly calculated the patient monthly liabilities for several of their residents in a manner contrary to law. (Doc. 18, at 2–3). Each of the individual beneficiaries identified in the second amended complaint (hereinafter referred to collectively as "the residents"), and the alleged impropriety in Defendants' calculation of that person's benefits, shall be outlined in turn:

**John Houston:** John Houston is an elderly resident at Indianspring of Oakley, an Ohio nursing home run by Plaintiff Carespring. (Doc. 18, at 3). As Mr. Houston's designated authorized representative for Medicaid purposes, Carespring submitted an application through ODM for Medicaid benefits for Mr. Houston on March 5, 2015. ODM determined that Mr. Houston's patient liability was $3,276.00 per month. (*Id.* at 6). The income used by ODM to calculate Mr. Houston's monthly patient liability includes $300 per month in court-ordered spousal support benefits that are deducted from Mr. Houston's pension payments prior to any deposit being made into Mr. Houston's bank account. (*Id.*). Carespring alleges that the inclusion of this $300 per month in calculating Mr. Houston's total $3,276.00 monthly patient liability is unlawful.

**Samuel Morris:** Samuel Morris was a resident at the Good Shepherd Home run by Defendant Good Shepherd until his death on November 23, 2015. Mr. Morris received Medicaid benefits throughout his residency at Good Shephard. Sometime following the initial determination of his monthly patient liability, Mr. Morris was granted a divorce from his wife. As part of the divorce, Mr. Morris was ordered to pay spousal support of $1600.00 per month. In late 2014, the Ashland County Department of Job and Family Services ("JFS") recalculated Mr. Morris's monthly patient liability to $3,643.00 per month. This liability figure was based on an income that included Mr. Morris's mandated spousal support. Good Shephard, as Mr. Morris's authorized Medicaid representative, requested an administrative hearing with ODM in which it was requested that Mr. Morris's monthly patient liability be reduced. Following the hearing held on March 14, 2016, the administrative examiner determined that Mr. Morris's mandated spousal support payments were properly included in his monthly patient liability. (Doc. 23-1).

**Leola Amburgey:**  Leola Amburgey is a resident of Hillspring of Springboro, a nursing home run by Plaintiff Carespring.  In February 2016, Carespring submitted an application for Medicaid benefits on Ms. Amburgey's behalf through ODM.  On February 18, 2016, ODM approved Ms. Amburgey's application and determined her monthly patient liability to be $704.00.  (Doc. 18, at 8).  Plaintiffs contend that Ms. Amburgey's social security and/or pension payments, which were used to determine her monthly patient liability, are sent directly to her son, who converts the funds for entirely his own benefit.  Accordingly, Plaintiffs contend that those funds are improperly counted by ODM in calculating Ms. Amburgey's monthly patient liability.  Ms. Amburgey has unpaid patient liability payments owed to Carespring in excess of $5,846.00.  (*Id.*).  Carespring sent Defendants a request for reimbursement of these unpaid liabilities, but have received no answer.

**Gary Boseman:**  Gary Boseman is a resident at Indianspring of Oakley, an Ohio nursing home run by Plaintiff Carespring.  In September 2016, Carespring submitted an application on Mr. Boseman's behalf for Medicaid benefits through ODM.  At the time of this application, an automatic deduction in the amount of $231.15 per month for back taxes to the IRS was subtracted from Mr. Boseman's monthly social security income.  (*Id.* at 9).  Defendants approved Mr. Boseman's Medicaid benefits effective September 1, 2016, with a calculated monthly patient liability of $1,596.00.  (*Id.*).  The income used to determine Mr. Boseman's patient liability included the monthly deduction for back taxes.  Plaintiffs contend that the use of Mr. Boseman's back taxes payments in calculating his patient liability was contrary to law.

**Betty Conger:**  Betty Conger is a resident of Hillspring of Springboro, a nursing home run by Plaintiff Carespring.  Following her admission to Hillspring in October 2015, Carespring submitted an application for Medicaid benefits on Ms. Conger's behalf.  ODM determined that Ms. Conger's monthly patient liability would be $0.00 from October 2, 2015 through December 31, 2016 to allow her to repay social security for a previous overpayment of benefits and would be raised to $737.00 effective January 1, 2017.  (*Id.* at 10).  Ms. Conger had not completed the repayment of social security benefits by January 1, 2017, but her monthly patient liability still increased as planned.

**Calvin Hardy:**  Calvin Hardy is a resident of Hillspring of Springboro, a nursing home run by Plaintiff Carespring.  Following Mr. Hardy's admission to Hillspring on July 30, 2013, Carespring submitted an

application for Medicaid benefits on Mr. Hardy's behalf. ODM determined that Mr. Hardy's monthly patient liability would be $348.00 from September 1, 2013 through December 21, 2013 and $349.00 per month effective January 1, 2014. (*Id.* at 11). Plaintiffs allege that Mr. Hardy's family members and girlfriend have been receiving his social security and/or pension payments and misappropriating them for personal use. (*Id.*). Carespring sent Defendants a request for reimbursement of $1,497.00 owed by Mr. Hardy, but no action has been taken. (*Id.* at 12).

**Eugene Horn:** Eugene Horn was a resident of Hillspring of Springboro, a nursing home run by Plaintiff Carespring, until his death on December 17, 2016. On January 12, 2016, Mr. Horn was approved for Medicaid benefits. Contemporaneous with that approval, ODM determined that Mr. Horn's monthly patient liability was $888.00. (*Id.* at 12). Plaintiffs contend that Mr. Horn never received any of his social security and/or pension payments because they were sent to Mr. Horn's daughter, who misappropriated them for her own benefit. Carespring claims it is owed over $1,219.00 in patient liability and has sent Defendants a request for reimbursement, but that the request has not been granted to date. (*Id.* at 13).

**Virginia Newell:** Virginia Newell is a resident of Hillspring of Springboro, a nursing home run by Plaintiff Carespring. On March 2, 2016, Ms. Newell's application for Medicaid benefits was approved. (*Id.*). Ms. Newell's monthly patient liability was initially determined to be $1,746.00 but was adjusted to $1,712.00 effective June 1, 2015. (*Id.* at 13–14). Plaintiff Carespring, which manages Ms. Newell's income, claims that it receives less income for Ms. Newell than her monthly patient liability. (*Id.* at 14). Carespring filed a request for reimbursement with Defendants; to date, that request has not been granted.

**Betty Smith:** Betty Smith is a resident of Shawneespring of Harrison, a nursing home run by Plaintiff Carespring. On November 10, 2016, Ms. Smith was approved for Medicaid benefits effective December 1, 2016. (*Id.* at 16). Contemporaneous with that approval, ODM determined that Ms. Smith's monthly patient liability was $1,568.00 for June 2016 and $1,212.00 moving forward. (*Id.*). Plaintiffs contend that Ms. Smith never received any of his social security and/or pension payments because they were sent to her family members, who misappropriated them for their own benefit. Carespring sent Defendants a request for reimbursement of unpaid medical bills, but that the request has not been granted to date. (*Id.*).

**Nancy Webb:** Nancy Webb is a resident of Shawneespring of Harrison, a nursing home run by Plaintiff Carespring. On May 20, 2016, Ms. Webb

was approved for Medicaid benefits effective June 1, 2016. (*Id.* at 15). Contemporaneous with that approval, ODM determined that Ms. Webb's monthly patient liability was $1,459.00. (*Id.*). At the time of Ms. Webb's Medicaid application, her social security income was subject to a deduction for the payment of a U.S. Treasury loan. (*Id.*). ODM's monthly patient liability calculation did not deduct Ms. Webb's loan payments from the income used to determine her monthly patient liability.

**Mary Kim:** Mary Kim was a resident of Heritagespring of West Chester, a nursing home run by Plaintiff Carespring until her death on February 16, 2017. (*Id.* at 16). On June 11, 2016, Ms. Kim was approved for Medicaid benefits. (*Id.* at 17). Contemporaneous with that approval, ODM determined that Ms. Kim's monthly patient liability was $1,391.00. (*Id.*). Plaintiffs contend that Ms. Kim never received any of her social security and/or pension payments because they were sent to her family members, who misappropriated them for their own benefit. Carespring received no patient liability payments from Ms. Kim or her family members from July 2016 through February 2017.

The various claims Plaintiffs bring on behalf of each of these residents share a common underlying theme. In each resident's case, Defendant ODM, by applying Ohio's Medicaid plan to the facts of the resident's circumstances, determined that the resident was required to pay a certain amount toward his or her healthcare each month as a monthly patient liability based upon the income that resident was receiving. Plaintiffs claim that in each of these cases, for varying reasons, the income ODM was attributing to the residents was not actually available for the residents to use for their own healthcare.

In the case of some of the residents (*e.g.*, the residents who were paying a court-ordered spousal support each month), there is no factual dispute that at least some of the money attributed to the resident's monthly income for purposes of calculating monthly patient liability was not actually available for the resident to spend as he or she saw fit. However, the regulations governing Ohio's Medicaid plan specifically contemplate that

"[u]nder certain circumstances, the amount of income which must be determined as available to an individual may be greater than an individual will receive or have for his own use." Ohio Admin. Code 5160:1-3-03.1(E).

The Ohio regulation governing the calculation of the residents' monthly patient liabilities at the time of this suit laid out the method used by ODM to calculate each resident's monthly patient liability. Ohio Admin. Code 5160:1-3-04.3 (since repealed). That regulation required monthly patient liability to be calculated by taking a Medicaid recipient's total income minus various specific deductions listed in the rule. None of the specific deductions outlined by the rule would have reduced any of the residents' monthly patient liabilities based on the facts alleged by Plaintiffs—in other words, in calculating the residents' monthly patient liabilities, ODM followed the Ohio Medicaid state plan to the letter.

Plaintiffs, however, do not contend that Defendants failed to comply with Ohio's Medicaid plan but rather argue that Ohio's Medicaid plan itself is in violation of the federal Medicaid regulations that set parameters for what must be provided by a state that chooses to participate in Medicaid. Based on this foundational argument, Plaintiffs' second amended complaint raises the following claims against Defendants:

- Counts 1–6 seek declaratory relief on behalf of the various nursing home residents being represented by Plaintiffs as their Medicaid authorized representatives. Specifically, these counts seek a declaration that each resident's monthly patient liability was calculated in a manner contrary to federal law. These counts also request that each resident be given a retroactive adjustment to their monthly patient liabilities to correct Defendants' unlawful actions.
- Count 7 alleges that Defendants have violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, by making unlawful monthly

6

patient liability calculations that disparately impacted the disabled residents.

- Count 8 is a claim under 42 U.S.C. § 1983 alleging that Defendants violated the residents' constitutional rights to due process and equal protection.
- Count 9 is a claim under 42 U.S.C. § 1983 that alleges Defendants violated the Federal Medicaid Act's medical assistance mandate and nursing facility services mandate, citing 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(A).
- Count 10 alleges Defendants violated the Federal Medicaid Act's reasonable promptness requirement, citing 42 U.S.C. § 1396a(a)(8).
- Count 11 alleges Defendants violated the Rehabilitation Act of 1973, 29 U.S.C. § 794.
- Count 12 is a general claim for injunctive relief.

(Doc. 18, at 23–44).

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough

to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (*citing* Fed. Rule Civ. P. 8(a)(2)).

## III. ANALYSIS

### A. Standing

A plaintiff must show that he or she has standing in order to demonstrate that the Court has jurisdiction in this case. *Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (standing is jurisdictional); *Midwest Media Property, LLC v. Symmes Township*, 503 F.3d 456, 461 (6th Cir. 2007) (plaintiff has burden of showing standing). There are two aspects to standing. The first is the constitutional standing aspect, which requires a plaintiff to show injury, causation, and redressability. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The second is the prudential standing doctrine, which embodies judicially self-imposed limits on the exercise of jurisdiction. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). One prudential

standing doctrine requires a plaintiff to assert his own legal rights and interests and not those of third parties. *Id.* at 499.

The nursing home Plaintiffs in this action allege that they have standing to pursue this case from two separate sources. First, Plaintiffs allege that they have standing to file this suit on behalf of the allegedly wronged individuals as their designated assignees. Second, Plaintiffs allege that they have standing to sue as "organizations" on behalf of their "members." The Court will address each of these arguments in turn.

### 1. Standing as assignees

Plaintiffs argue that they have standing to sue on behalf of the named residents in this action because each named resident designated his or her respective nursing home as an "authorized representative" with authority to advocate on his or her behalf in pursuing Medicaid benefits. Included as an attachment to Plaintiffs' response to the motion to dismiss are filled out forms from the Ohio Department of Job and Family Services on behalf of each individual resident named in this case purporting to designate one of the nursing home Plaintiffs as an authorized representative. (Doc. 25-1).[1] Specifically, the forms state that the nursing home is authorized to represent the resident regarding

---

[1] Defendants argue that the Court must not consider these authorization forms which were not attached to the second amended complaint and only included in Plaintiffs' response to the present motion, as "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (Doc. 29, at 10 (quoting *Garrett Day LLC et al. v. Int'l Paper Co. et al.*, Case No. 3:15-cv-36, Doc. 142, at 19 (S.D. Ohio Mar. 1, 2016)). Defendants are correct in their summation of the law. However, as in *Garrett Day*, Exhibit A to Plaintiffs' response to the present motion shows that "Plaintiffs may be able to fairly easily correct the pleading defects discussed above" with an additional amended complaint. *Garrett Day*, Doc. 142, at 23. Rather than require Plaintiffs to file a third amended complaint with the information that is already available to the Court, in the interest of judicial economy, the Court will instead consider the information contained in Plaintiffs' Exhibit A to permit an analysis of the substantive issues of Plaintiffs' claims, which will moot the issue.

Medicaid and that the nursing home may "[t]ake any action that may be needed to ensure that [the resident] [receive[s] or continue[s] to receive [Medicaid benefits]." (*See id.*).

Defendants make two arguments to counter Plaintiffs' assertions that these forms grant standing to the nursing home Plaintiffs in this case—first, that designated representatives for the purpose of obtaining Medicaid benefits do not have the authority to file a federal lawsuit on behalf of the designating individual, and second, that errors with the individual forms fail to properly designate the nursing home Plaintiffs as representatives for the individual residents. (Doc. 23, at 29–31; Doc. 29, at 14–15).

### a. A representative designated for the general purpose of dealing with the Department of Medicaid has authority to file an original federal action to secure Medicaid benefits on behalf of a designating individual.

An "authorized representative" is a defined term in the Medicaid context. 42 C.F.R. § 435.923 states that "[t]he agency must permit applicants and beneficiaries to designate an individual or organization to act responsibly on their behalf in assisting with the individual's application and renewal of eligibility and other ongoing communications with the agency." That regulation goes on to state that

> Applicants and beneficiaries may authorize their representatives to—
> (1) Sign an application on the applicant's behalf;
> (2) Complete and submit a renewal form;
> (3) Receive copies of the applicant or beneficiary's notices and other communications from the agency;
> (4) Act on behalf of the applicant or beneficiary in all other matters with the agency.

42 C.F.R. § 435.923 (b).

In this case, the residents are all considered "beneficiaries" for purposes of applying 42 C.F.R. § 435.923(b). Under 42 C.F.R. § 400.200, "[b]eneficiary means a person who is entitled to Medicare benefits and/or has been determined to be eligible for Medicaid." Each of the residents in this case has been previously determined to be eligible for Medicaid; accordingly, they may designate an authorized representative pursuant to 42 C.F.R. § 435.923(b).

Defendants argue that an authorized representative in the Medicaid context is only permitted to take the specifically enumerated actions listed in 42 C.F.R. § 435.923(b), and accordingly is not permitted to file an action on behalf of a designating individual in federal court:

> These activities [listed in 42 C.F.R. § 435.923(b)] comprise the full scope of activities that an authorized representative may perform—the authorized representative regulation says so. It states that "an authorized represent-ative is responsible for "fulfilling all responsibilities *within the scope of the authorized representation, as described in [42 C.F.R. § 435.923(b)].*"

 (Doc. 29, at 16 (quoting 42 C.F.R. § 435.923 (d)(1)) (emphasis in original)).

Defendants' argument is without merit. The regulation authorizing designated representatives in the Medicaid context specifically allows a representative to "act on behalf of the applicant or beneficiary in *all other matters with the agency,*" a general clause that gives the representative broad latitude in working on a beneficiary's behalf to secure access to Medicaid benefits. 42 C.F.R. § 435.923 (b)(4) (emphasis added). Defendants have not presented a compelling argument as to why this general clause would not give an authorized representative the power to sue a state Department of Medicaid for a perceived violation of a beneficiary's right to access benefits—a common

enough action when benefits are in dispute.  *See also Doctors Nursing & Rehab. Ctr., LLC v. Norwood*, 2017 WL 2461544, at *3–4 (N.D. Ill. June 7, 2017) (holding that authorized representatives have the authority to file federal litigation to secure Medicaid benefits on behalf of applicants).

Defendants claim that "[i]t would be unreasonable to construe federal regulations regarding the scope of an authorized representative's responsibilities the way the Nursing Homes construe them—that is, granting to the authorized representative any conceivable powers designated by the applicant or recipient."  (Doc. 29, at 17).  This argument is supplemented with examples of alleged powers that would necessarily be granted to designated Medicaid representatives were the regulation in question construed to allow representatives to file a civil action:

> It would allow an authorized representative to assume the powers of a guardian or execute an individual's estate without going through appropriate probate court proceedings, supplant requirements surrounding durable powers of attorney for health care, and act as power of attorney for the individual's body and property, without executing the appropriate forms. It would also allow the release of protected HIPAA information without the required notices and disclosures, such as a statement that the provider cannot condition treatment on an authorization to release HIPAA-protected information, and a statement that information disclosed pursuant to the authorization may be re-disclosed and no longer protected by HIPAA. *See* 42 C.F.R. § 164.508(b)(1), (c)(1)(v)-(vi), and (c)(2)(i)-(iii).

(*Id.*).

Defendants need not fear their hypothetical slippery slope.  While the regulations permitting authorized Medicaid representatives contain an open ended clause that does not limit the powers of a representative to a small list of specifically enumerated actions, the regulation is exceedingly clear that all powers of a designated representative must

only be used in the context of securing Medicaid benefits for a beneficiary and those actions needed to accomplish that goal. No reasonable reading of the implementing regulations would permit a representative authorized through the forms submitted into evidence in this case to execute an estate, make health care decisions with power of attorney, or act as power of attorney for an individual's body or property. Fairly read, 42 C.F.R. § 435.923 (b) permits an authorized representative to act broadly, but only on the narrow topic of Medicaid benefits. That includes filing a civil action in response to a perceived unlawful reduction or denial of benefits.

      **b.  Defendants' assertion that the documentation provided for several of the residents fails to sufficiently establish Plaintiffs' authority to act on their behalf is meritorious but mooted by the Court's ruling on the substantive issues of this case.**

Defendants argue in the alternative that, even if a nursing home plaintiff's status as a residents' authorized representative gives the nursing home the authority to sue the state Department of Medicaid on that resident's behalf, Plaintiffs in this case have failed to establish that several of the residents at issue properly designated one of the Plaintiffs as their authorized representative.

After examining the forms purportedly establishing Plaintiffs' status as authorized representatives for the residents, attached as Exhibit A to Plaintiffs' response to the motion to dismiss, the Court finds that Defendants' argument has merit with respect to several of the named residents in this case. The authorization forms for residents John Houston, Betty Conger, Eugene Horn, Virginia Newell, Nancy Webb, and Betty Smith are not signed by those individuals—rather, they are each signed by an unidentified third

party. (*See* Doc. 25-1). In some of these cases the signatory's last name indicates that he or she is likely related to the resident in question. However, under Ohio law, there is no presumption of agency between spouses or between children and their parents. *Clemente v. Gardner*, No. 2002CA00120, 2004 WL 953700, 2004-Ohio-2254, (Ohio App. April 26, 2004); Ohio Jur. 3d, Agency and Independent Contractors § 11; 59 Am Jur. 2d Parent and Child § 2.

Accordingly, Plaintiffs would need to produce additional evidence demonstrating that each individual who signed the authorized representative contracts had the authority to do so on a resident's behalf for that resident's claims to proceed. Were the case to move forward, the Court would permit Plaintiffs to file a third amended complaint for that purpose. However, this case will not proceed, as the Court has reviewed the substantive merits of all of Plaintiffs' claims and found them to be without merit. *See infra*. Therefore, the issue of whether each individual resident has appropriately assigned a nursing home plaintiff as his or her authorized representative for purposes of this action is moot.

### 2. Standing as an association

As discussed above, Plaintiffs have standing to sue on behalf of the residents who have designated Plaintiffs as authorized representatives for purposes of securing Medicaid benefits. *See supra* Part III.A.1. However, Plaintiffs also argue in the alternative that they have standing to sue for Medicaid benefits on behalf of any resident, even one who has not designated the nursing home as an authorized representative, based

on the doctrine of associational standing. (Doc. 25, at 16). This argument is without merit.

The Supreme Court stated in *Warth v. Seldin* that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." 422 U.S. 490, 511 (1975) (citations omitted). Two years later, the Supreme Court established clear guidelines for determining whether an association had standing in any particular case: "Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs claim that each of these factors is present in this case. However, the deficiency in Plaintiffs' claim to associational standing lies in a more fundamental flaw— Plaintiffs are not "associations," and the residents are not "members" of those associations. In *Hunt*, the Supreme Court ruled upon the question of whether the Washington State Apple Advertising Commission, a state agency, could utilize

associational standing on behalf of Washington State apple growers and dealers despite

not being a traditional voluntary membership organization. In ruling that the

Commission had standing, the Court laid out a framework to determine whether a

potential plaintiff is an "association" for purposes of associational standing under *Warth*:

> The only question presented, therefore, is whether, on this record, the Commission's status as a state agency, rather than a traditional voluntary membership organization, precludes it from asserting the claims of the Washington apple growers and dealers who form its constituency. We think not. The Commission, while admittedly a state agency, for all practical purposes, performs the functions of a traditional trade association representing the Washington apple industry. As previously noted, its purpose is the protection and promotion of the Washington apple industry; and, in the pursuit of that end, it has engaged in advertising, market research and analysis, public education campaigns, and scientific research. It thus serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation.
>
> Moreover, while the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests. Nor do we find it significant in determining whether the Commission may properly represent its constituency that "membership" is "compelled" in the form of mandatory assessments. Membership in a union, or its equivalent, is often required. Likewise, membership in a bar association, which may also be an agency of the State, is often a prerequisite to the practice of law. Yet in neither instance would it be reasonable to suggest that such an organization lacked standing to assert the claims of its constituents.

*Id.* at 344–45.

Here, based on the guidance laid out in *Hunt*, this Court finds that the Plaintiff

nursing homes are not associations in which the residents are members. There has been

no evidence submitted suggesting that the residents have any of the hallmark indicia of "membership" that were illuminated in *Hunt*. Specifically, there is no allegation that the residents of the Plaintiff nursing homes have any say as to the leadership at the homes or the policies pursued by the homes. There is similarly no indication that residents themselves make up the leadership at the nursing homes in which they reside. Nursing home residents are more akin to customers than members of an association—they may choose to "vote with their wallet" by staying at one facility or the other, but nothing suggests that a nursing home and its residents have the intimate, collaborative relationship of an association and its members when establishing either the day to day operation or the overall goals and direction of the nursing home. Because nursing homes and their residents do not have an association/member relationship, their interests cannot be said to be so aligned that a nursing home has standing by default to sue on a resident's behalf. Standing must be instead established on a case by case basis through individual residents' designation of their nursing home as an authorized representative.[2]

---

[2] *See also Diversicare v. Glisson*, No. 16-141, 2017 WL 4873510, at *4 (E.D. Ky. Oct. 27, 2017) (finding no associational standing for a for-profit nursing home that had residents akin to customers and that was not formed to advocate for residents); *Group Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 918 (D. Minn. 2000) (denying associational standing to health maintenance organizations (HMOs) because its members did not have indicia of membership and HMO instead maintained a business-consumer relationship with those members); *Allstate Ins. Co. v. City of Chicago*, No. 02C5456, 2003 WL 1877570, at *4 (N.D. Ill. Apr. 14, 2003) (finding a business-consumer relationship between the insurance company and its insureds did not show sufficiently collective views to confer associational standing on insurance company). Plaintiffs' mere interest in the subject does not confer associational standing upon them.

### B. Other Preliminary Issues

#### 1. Dismissal of Defendant Dungey based upon Ohio Rev. Code § 5162.03 is inappropriate at this time

One of the two Defendants named in the second amended complaint is Cynthia Dungey, the Director of the Ohio Department of Job and Family Services. The second amended complaint outlines Plaintiffs' basis for including Director Dungey in this action:

> The Defendant Cynthia C. Dungey is the Director of the Ohio Department of Job and Family Services ("ODJFS"), which is the department of the State of Ohio that, under Ohio law and applicable federal regulations, was the single state agency charged with responsibility for administering and supervising Ohio's Medicaid program at the time the Medicaid applications at issue here were submitted. At all times material to this Complaint, Defendant Dungey acted under color of state law in administering the regulations, customs, policies, and practices material herein. She is sued in her official capacity only.

(Doc. 18, at 4).

Defendants argue that the second amended complaint fails to properly state a claim against Director Dungey because ODJFS had no authority or responsibility in determining the monthly patient liability levels of Medicaid patients during the time period when the allegedly unlawful acts outlined in the second amended complaint took place. Defendant ODM became the sole Medicaid agency responsible for the administration of Ohio's Medicaid program after September 29, 2013. *See* Ohio Rev. Code § 5162.03 ("For the purpose of the "Social Security Act," section 1902(a)(5), 42 U.S.C. 1396a(a)(5), the Department of Medicaid shall act as the single state agency to supervise the administration of the Medicaid program."). The claims in this case all revolve around ODM's calculation of the residents' monthly patient liabilities when each

resident became eligible for Medicaid. Each of those calculations occurred after September 29, 2013.

Plaintiffs argue that discovery is required to determine which party is at fault for the allegedly unlawful monthly patient liability calculations, and that it is therefore premature to dismiss Director Dungey at this time. This argument is well-taken. Defendants admit that ODM has chosen to delegate certain tasks to ODJFS, including the "authority to adjudicate disputes regarding Medicaid eligibility." (Doc. 23, at 25 fn. 13 (citing Ohio Rev. Code 5101.35(B))). The second amended complaint states that several of the residents filed inaction appeals with ODJFS following the initial determinations of their monthly patient liabilities. (Doc. 18, at 8, 12–15). ODJFS's actions during those appeals (or inaction in responding to them) could contribute to certain claims in the second amended complaint, such as Plaintiffs' due process claims.

Accordingly, dismissal of ODJFS or Director Dungey based upon Ohio Rev. Code § 5162.03 would be inappropriate at this time.

### 2. The Eleventh Amendment does not bar Plaintiffs' requests for relief

Defendants claim that Plaintiffs' claims must be dismissed because any relief sought by those claims would be retroactive relief barred by the Eleventh Amendment. (Doc. 23, at 45–46). In a recent case involving the application of Medicaid law, a Magistrate Judge within this district distinctly summarized the Eleventh Amendment's application to cases such as this:

Generally, the Eleventh Amendment to the United States Constitution bars suit against a State or its agencies or departments in federal court regardless of the nature of the relief sought. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (1996); *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 100 (1984). There are exceptions to Eleventh Amendment immunity, however. *Carten v. Kent State University*, 282 F.3d 391, 397 (6th Cir. 2002). An exception to Eleventh Amendment immunity applies where a plaintiff seeks prospective relief to compel state officials to comply with federal law. *See Ex parte Young*, 209 U.S. 123 (1908); *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 508 (6th Cir. 2008). When this exception applies, a "court may enter a prospective injunction that costs the state money, but only if the monetary impact is ancillary, *i.e.*, not the primary purpose of the suit." *Barton v. Summers*, 293 F.3d 944, 950 (6th Cir. 2002) (citing *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)). An injunction ordering retroactive benefits for past violations of federal law is prohibited by the Eleventh Amendment. *Edelman,* 415 U.S. at 666-69.

A second exception applies to claims for which the Eleventh Amendment immunity of the State has been waived or validly abrogated by Congress. *Carten*, 282 F.3d at 397; *Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d 409, 413 (6th Cir. 2002); *Nihiser v. Ohio E.P.A.*, 269 F.3d 626, 627-28 (6th Cir. 2001).

*Hillspring Healthcare Center, LLC v. Dungey, et al.*, 2018 WL 287954 (S.D. Ohio Jan. 4, 2018) (Bowman, M.J.).

Plaintiffs argue that both exceptions identified in the passage quoted above apply to this case. First, Plaintiffs argue that most of the relief sought by the second amended complaint is prospective in nature. Plaintiffs claim that, by being assigned a patient monthly liability that is in violation of federal Medicaid law, the residents are being continually subjected to an ongoing violation of the law as they receive fewer benefits than they are entitled to each month. (*See* Doc. 25, at 37). Under the *Ex Parte Young* doctrine articulated by the U.S. Supreme Court, "suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh

Amendment." *Telespectrum, Inc. v. Public Service Com'n of Kentucky,* 227 F.3d 414, 419 (6th Cir. 2000) (citing *Ex Parte Young*, 209 U.S. 123, 159–60 (1908)).

Plaintiffs' argument is well-taken with regard to certain relief requested for certain residents. For those residents who are alive, Plaintiffs' request for declaratory relief that their ongoing monthly patient liabilities have resulted in their receiving less in Medicaid funds than they are entitled to can be fairly characterized as a request for prospective relief. Such a declaration from the Court would result in a direct benefit for those residents moving forward.

Not all of Plaintiffs' requests for relief can reasonably be seen as prospective. Plaintiffs' requests for retroactive payment of entitled funds for all residents, and all of Plaintiffs' claims related to deceased residents, must be characterized as requests for retroactive relief. Those requests for relief are not shielded from standard Eleventh Amendment jurisprudence by the *Ex Parte Young* doctrine. However, Plaintiffs argue that these claims should be allowed to proceed as well. Although Plaintiffs acknowledge that they have made requests for retroactive relief, they claim to only seek retroactive relief under their claim related to the Rehabilitation Act. Ohio has waived Eleventh Amendment immunity for Rehabilitation Act claims. *See Carten v. Kent State University*, 282 F.3d 391, 397 (6th Cir. 2002).

Accordingly, Plaintiffs' claims are not subject to summary dismissal due to the Eleventh Amendment.

### 3.    The claims of deceased residents

Three of the residents on whose behalf Plaintiffs have brought this action died before the action was filed.  *See supra* Part I.   Defendants' motion to dismiss argues that the §1983 claims on behalf of these individuals did not survive their death and should be dismissed.  (Doc. 23, at 33–34).  There are two issues that must be resolved in determining whether Plaintiffs' claims on behalf of deceased residents can proceed: (1) whether a resident's § 1983 claims survive his or her death, and if so, (2) whether Plaintiffs remain authorized to bring those claims.

When evaluating the validity of claims brought under 42 U.S.C. § 1983 on behalf of the deceased, courts first look to the state's survival statute to determine if a § 1983 claim survives a person's death.  *Robertson v. Wegmann,* 436 U.S. 584, 590 (1976); *Jaco v. Boechle,* 739 F.2d 239, 241 (6th Cir. 1984).  Plaintiffs argue that the relevant statutory provision in this case is Ohio Revised Code section 2305.21, which states as follows:

> In addition to the causes of action which survive at common law, causes of action for mesne profits, or injuries to the person or property, for deceit or fraud, also shall survive, and such actions may be brought notwithstanding the death of the person entitled or liable thereto.

Ohio Rev.Code § 2305.21.

The Sixth Circuit has not ruled on whether a § 1983 claim for Medicaid Act violations survives the beneficiary's death.  Defendants argue that the "property" interest a beneficiary has in his or her Medicaid benefits is not relevant to the Ohio survival statute, which applies to only "the state-created concept of property, not the federal and constitutional concepts of 'property' under the Fourteenth Amendment[.]"  (Doc. 29, at

10).  Defendants ask the Court to adopt the rationale supporting the District of Kansas's ruling in *Bernard v. Kansas Health Policy Authority*, in which the court held that Medicaid benefits were not considered "real or personal estate" under Kansas's survival statute, and that a §1983 claim for Medicaid benefits accordingly could not survive the beneficiary's death.  2012 WL 941674 (D. Kan. Mar. 20, 2012).

The Court declines to follow the holding of *Bernard*, which analyzed Kansas law and had little discussion of the property nature of Medicaid benefits.  The Court instead agrees with the well-reasoned analysis of a Magistrate Judge in this district that ruled that a §1983 claim for Medicaid benefits could survive the death of a beneficiary based on the Ohio survival statute:

> The term "personal property" under the statute "is not limited to tangible goods and chattels. Intangible choses in action, such as a contract right and the right to bring a cause of action in a court of law, are also considered personal property." *Loveman v. Hamilton,* 66 Ohio St.2d 183, 420 N.E.2d 1007, 1009 (1981) (citations omitted). Thus, for example, the Ohio Supreme Court has held that a cause of action for legal malpractice involves a property interest that survives the death of the former client. *Id.* at 1008. Injury to property is not "confined to physical damage or destruction of tangible property, but the word is broad enough to include the lessening in value of an estate by a depletion in value thereof resulting from tort." *Adams v. Malik,* 106 Ohio App. 461, 155 N.E.2d 237, 239 (1957).
>
> Medicaid is an entitlement program under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* and plaintiffs have a property interest in state-provided benefits for which they hope to qualify. *Hamby v. Neel,* 368 F.3d 549, 559 (6th Cir.2004); *Ability Center of Greater Toledo v. Lumpkin,* 808 F.Supp.2d 1003, 1026 (N.D. Ohio 2011). *See also Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Because Ohio recognizes that intangible property interests survive the death of the decedent, [the decedent's] property interest in her eligibility for Medicaid assisted living waiver benefits for up to three months prior to the date of application survives her death.

*Price v. Medicaid Dir.*, 310 F.R.D. 345, 360 (S.D. Ohio 2015) (Litkovitz, M.J.) (reversed on other grounds).  Accordingly, the residents' Medicaid claims survived their deaths.

However, an entirely separate issue from whether the residents' claims survived their deaths is whether Plaintiffs retained the authority to act as the residents' authorized representatives following the residents' deaths.  After reviewing relevant Ohio case law and related federal court opinions, the Court concludes that Plaintiffs' status as authorized representatives for the deceased residents terminated upon those residents' deaths.  The relevant case law was summarized in the *Hillspring* opinion issued from this district earlier this year:

> In an analogous situation where a person was given power of attorney for a Medicaid applicant, which would make that person an authorized representative under 42 C.F.R. § 435.923, the power of attorney has been held to lapse upon the individual's death such that any claims asserted by the attorney-in-fact in the state appellate court were moot. *Santa v. Ohio Dep't of Human Servs.*, 136 Ohio App. 3d 190, 194 (Ohio App. Ct. Jan. 31, 2000) (holding that power of attorney lapsed upon death of individual who was denied Medicaid benefits and that the person who had held power of attorney was not proper party to maintain appeal of common pleas court's decision affirming the denial of Medicaid benefits to applicant). In that case, the proper representative of the deceased individual was the administrator of the estate, not the authorized representative. *Id.*; *see also Latimore v. Hartford Life & Acc. Ins. Co.*, No. 2011CA00227, 2012 WL 382932, at *4 (Ohio App. Ct. Jan. 30, 2012) (concluding that an individual's "authority under the power of attorney lapsed upon [the insured's] death" and that she "lacks legal authority to represent [the insured]" in the judicial proceeding where she was not the executor of the estate). The Eastern District of Kentucky recently has applied similar reasoning to circumstances that are virtually identical to those in this case. *Diversicare v. Glisson*, No. 16-141, 2017 WL 4873510, at *4 (E.D. Ky. Oct. 27, 2017). Specifically, the district court determined that a nursing home serving as an authorized representative could not continue to represent that resident after her death in a federal lawsuit because "only an administrator of [the deceased's] estate could bring a federal claim on her

behalf[.]" *Id.* These holdings reflect that an authorized representative does not have unbridled authority to continue representing an individual after her death and after a final decision on her Medicaid eligibility in any and all court proceedings in which it may have some ongoing interest.

*Hillspring Health Care Ctr., LLC v. Dungey*, 2018 WL 287954 (S.D. Ohio Jan. 4, 2018) (Bowman, M.J.). The analysis of the above-cited opinions on this issue is sound. Plaintiffs derive their authority to act as authorized representatives for their residents through the residents' personal assignment of those powers. When a resident dies, the authority to act on that resident's behalf no longer can come from that individual's assignment, but must instead come from his or her estate. Without renewed authorization from the estate of a deceased Medicaid beneficiary, that beneficiary's authorized representative under 42 C.F.R. § 435.923 loses that authority upon the beneficiary's death.

Accordingly, Plaintiffs lack standing to pursue Medicaid claims on behalf of deceased residents without authorization from their estates.

### C. Plaintiffs' claims alleging that Defendants' calculations of their resident members' monthly patient liability are in violation of federal Medicaid law are without merit

Although Plaintiffs' amended complaint raises several claims alleging various statutory and constitutional violations, the central dispute between the parties in this case is relatively straightforward. Defendants calculated a patient monthly liability for each of the Medicaid recipient nursing home residents named in this case according to Ohio law. That calculation purports to examine the monthly income each resident receives and accordingly adjust the Medicaid payments to each resident so that no more is distributed

than necessary.  Plaintiffs claim that for each resident the calculated monthly patient liability was too high, as Ohio law permits certain funds to be counted as income that should not have been counted pursuant to federal Medicaid law.

The statutory basis for Plaintiffs' argument begins with 42 U.S.C. § 1396a, which states:

A state plan for medical assistance must—

. . .

(17) . . . include reasonable standards (which shall be comparable for all groups and may, in accordance with standards prescribed by the Secretary, differ with respect to income levels, but only in the case of applicants or recipients of assistance under the plan who are not receiving aid or assistance under any plan of the State approved under subchapter I, X, XIV, or part A of subchapter IV of this chapter, and with respect to whom supplemental security income benefits are not being paid under subchapter XVI of this chapter, based on the variations between shelter costs in urban areas and in rural areas) for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) *provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and* (in the case of any applicant or recipient who would, except for income and resources, be eligible for aid or assistance in the form of money payments under any plan of the State approved under subchapter I, X, XIV, or XVI, or part A of subchapter IV, or to have paid with respect to him supplemental security income benefits under subchapter XVI of this chapter) *as would not be disregarded (or set aside for future needs) in determining his eligibility for such aid, assistance, or benefits,* (C) provide for reasonable evaluation of any such income or resources, and (D) do not take into account the financial responsibility of any individual for any applicant or recipient of assistance under the plan unless such applicant or recipient is such individual's spouse or such individual's child who is under age 21 or (with respect to States eligible to participate in the State program established under subchapter XVI of this chapter), is blind or permanently and totally disabled, or is blind or disabled as defined in section 1382c of this title (with respect to States which are not eligible to participate in such program); and provide for flexibility in the application of such standards

with respect to income by taking into account, except to the extent
prescribed by the Secretary, the costs (whether in the form of insurance
premiums, payments made to the State under section 1396b(f)(2)(B) of this
title, or otherwise and regardless of whether such costs are reimbursed
under another public program of the State or political subdivision thereof)
incurred for medical care or for any other type of remedial care recognized
under State law;

42 U.S.C. § 1396a (emphasis added). Accordingly, a state's power to determine what

individual "income and resources" are available to reduce the necessary state expenditure

on a particular Medicaid patient is not unlimited—that determination must be "in

accordance with the standards" set by federal law.

Plaintiffs argue that the criteria used in Ohio to determine a Medicaid patient's

monthly patient liability are not in accordance with the standards set by federal law. In

support, Plaintiffs' response to the motion to dismiss cites to the federal regulation

defining "resources" for purposes of calculating Medicaid eligibility:

(a) Resources; defined. For purposes of this subpart L, resources means
cash or other liquid assets or any real or personal property that an
individual (or spouse, if any) owns and could convert to cash to be used
for his or her support and maintenance.

(1) If the individual has the right, authority or power to liquidate the
property or his or her share of the property, it is considered a
resource. If a property right cannot be liquidated, the property will
not be considered a resource of the individual (or spouse).
. . .

20 C.F.R. § 416.1201. Plaintiffs claim that because spousal support payments and money

misappropriated by third party relatives are never actually available for a patient to

convert into cash for use toward his or her own maintenance, 20 C.F.R. § 416.1201

excludes them from being counted as resources.

Plaintiffs' claim is based on a misunderstanding of the relevant federal law, and particularly on a conflation of the separate terms "resources" and "income," which are defined and outlined in separate portions of the Code and are accordingly treated differently. "Resources," defined in the section of the Code cited by Plaintiffs and quoted above, are those assets that an individual already has, without regard to the resources an individual regularly receives and will receive in the future. In contrast, "income" is a separate term and is defined thusly:

> Income is anything you receive in cash or in kind that you can use to meet your needs for food and shelter. *Sometimes income also includes more or less than you actually receive* (see § 416.1110 and § 416.1123(b)). In-kind income is not cash, but is actually food or shelter, or something you can use to get one of these.

20 C.F.R. § 416.1102 (emphasis added). Unlike in the regulation defining resources, the regulation defining income specifically states that in some cases an individual can be found to have a higher income than the money they are actually receiving. This is further outlined in a related regulation:

> Earned income may be in cash or in kind. We may include more of your earned income than you actually receive. We include more than you actually receive if amounts are withheld from earned income because of a garnishment or to pay a debt or other legal obligation, or to make any other payments. . . .

20 C.F.R. § 416.1110. Rather than prohibiting the inclusion of money earmarked for legal obligations such as child support in a Medicaid patient's income calculation, federal Medicaid rules expressly permit income to be included even if it is never actually received. This undermines the basis for all of Plaintiffs' claims in this case.

Plaintiffs cite a Ninth Circuit opinion to support the proposition that "court order spousal or child support income must not be counted as income of the Medicaid recipient." (Doc. 25, at 23 (citing *Dept. of Health Services of the State of Calif. v. Sec. of Health and Human Services*, 83 F.2d 323 (9th Cir. 1987))). However, Plaintiffs' assertion regarding the holding of that case is overbroad. In that case, the Secretary of Health and Human Services had rejected amendments to the State of California's Medicaid plan that sought (among other things) to exclude court ordered child and spousal support from any calculations of available income. *Dept. of Health Services*, 83 F.2d at 326. The Secretary argued that such exclusions were not exclusively set forth in the federal statutes governing Medicaid and that states did not have the authority to grant income exclusions beyond those provided by federal law. *Id.* at 327. The opinion in that case held that "an income exclusion may exist in SSI and, congruously, Medicaid even though Congress has not explicitly provided for an exclusion in wither the SSI or Medicaid statutes." *Id.* at 328. So while *Dept. of Health Services* stands for the proposition that states have more freedom to craft their Medicaid plans than simply applying exactly the definition of income provided by federal statute, subsequent Ninth Circuit opinions have stated that "the discussion in *DHS* concerning whether child support and alimony payments constitute income for SSI eligibility purposes is merely dicta." *Martin v. Sullivan*, 932 F.2d 1273, 1277 (9th Cir. 1990), *cert. denied*, 112 S.Ct. 648 (1991). *See also Cervantez v. Sullivan*, 963 F.2d 229, 233-34 (9th Cir. 1992) (following *Martin*'s analysis of *DHS*). Further, the Ninth Circuit in *Martin* found that

*DHS* "does not create a broad 'actual availability' principle that is to be applied to every case determining what constitutes 'income' . . . " *Martin*, 932 F.2d at 1277.

While California's legislature has chosen to exclude child and spousal support from a Medicaid recipient's income, Ohio's legislature has not. Federal courts ruling on the validity of other state Medicaid plans that include such funds as income have consistently ruled that the states had the authority to make that decision. *See, e.g.*, *Emerson v. Steffen*, 959 F.2d 119 (8th Cir. 1992) (holding that Minnesota's Medicaid plan, which included the portion of a recipient's disability benefits paid in child support as "available" for Medicaid eligibility purposes, "is a permissible one"); *Himes v. Shalala*, 999 F.2d 684 (2d Cir. 1993) (holding that New York State's recent change to its Medicaid plan that included court-ordered child support obligations as available income was not in violation of federal law). Although these rulings relate to child support payments, their reasoning is equally persuasive when applied to spousal support payments or money withheld by third party relatives. <u>Federal law explicitly contemplates that a Medicaid recipient's income may be greater than actual money received each month. States have significant discretion to determine exactly which money not received is still counted as income, and Ohio has made that determination in compliance with federal law.</u>

Accordingly, Plaintiffs' claims for a declaratory judgment stating that Ohio's Medicaid plan improperly includes certain "unavailable" funds when calculating a Medicaid recipient's monthly patient liability are without merit.

### D. Plaintiffs' ADA and Rehabilitation Act claims are without merit

Plaintiffs claim that by calculating their residents' patient monthly liabilities contrary to federal law, Defendants have violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. Specifically, Plaintiffs allege that "[t]he Defendants' failure to afford the Plaintiffs any reasonable modification in the Application/eligibility process due to their disabilities to obtain needed public benefits and services, to which they were entitled under federal law, and failure to grant their Medicaid benefits as a reasonable accommodation, constitutes actual or predictable discrimination in violation of the ADA, 42 U.S.C. § 12132 *et seq*. and 28 C.F.R. § 35.130 *et seq*." (Doc. 18, at 18).

Title II of the ADA states that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). In order to show that an individual was subject to discrimination by reason of a disability, the individual must show: (1) that "animus against the protected group was a significant factor;" and (2) a "but-for relationship between the protested act and the individual's liability." *See Anderson v. City of Blue Ash*, 798 F.3d 338, 357 & n.1 (6th Cir. 2015) (describing necessary animus); *Gohl v. Livonia Public Schools Dist*., 836 F.3d 672, 682 (6th Cir. 2016) (describing causation standard).

Plaintiffs' complaint fails to allege facts that would allow a reasonable finder of fact to conclude that any of Defendants' actions were motivated by the fact that the nursing home residents in this case were disabled. The central disagreement in this case

is over what resources ODM considers as available to an individual when calculating that individual's monthly patient liability. ODM's determination of what resources are considered in calculating an individual's monthly patient liability is based on its application of various provisions of the Ohio Administrative Code. (*See* Doc. 23, at 15–18). Plaintiffs argue that these provisions, which count as available income resources that Plaintiffs allege are actually unavailable, violate federal law. However, there is no allegation that a nondisabled individual would be treated differently by ODM, or that ODM would properly calculate a nondisabled individual's monthly patient liability where it has improperly calculated the monthly patient liabilities of the disabled persons at issue here.

Plaintiffs' Rehabilitation Act claim lacks merit for similar reasons. The Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of his or her disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under" certain governmental programs. *See* 29 U.S.C. § 794 (emphasis added). As stated above, Plaintiffs fail to adequately allege that Defendants' actions in calculating the residents' monthly patient liabilities were in any way impacted by the fact that the residents had a disability. On the contrary, it is clear from the pleadings that determinations made concerning the residents' monthly patient liabilities were made through the straightforward application of the Ohio Administrative Code. Plaintiffs contend that the Ohio Administrative Code is overruled by contrary federal law, but this is not relevant for purposes of the ADA and Rehabilitation Act claims in the complaint.

In their response to the motion to dismiss, Plaintiffs argue that their ADA and Rehabilitation Act claims can survive summary judgment because they have properly alleged that Defendants' actions failed to "reasonably accommodate[]" the residents' disabilities. (Doc. 25, at 24). This argument is without merit. The ADA's "reasonable accommodation" doctrine is applied in the context of employment discrimination suits, and is not properly applied to the facts of this case. Even were the Court to consider Plaintiffs' reasonable accommodation claim, such a claim would require that Plaintiffs had made a request for a reasonable accommodation. The complaint only lists one such request by Plaintiffs—that Defendants "grant their Medicaid benefits[.]" (Doc. 18, at 18, 19, 28, 40). This is not a request for a reasonable accommodation in the Medicaid application process, but rather is a request that the process have a different outcome. A dispute over the validity of a determination that was made without regard to any disability is not grounds for a valid claim under either the ADA or the Rehabilitation Act.

Accordingly, Plaintiffs' claims under the ADA and the Rehabilitation Act are dismissed.

### E.  Plaintiffs' due process and equal protection claims are without merit

Count eight of Plaintiffs' complaint alleges that Defendants violated the residents' constitutional rights to due process and equal protection in violation of 42 U.S.C. § 1983. (Doc. 18, at 41).

Plaintiffs' complaint does not allege facts that would support a claim that the residents' due process rights were violated. Plaintiffs' response to the motion to dismiss outlines the basis for this claim:

The Sixth Circuit has held that "the touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard in a meaningful manner". *Friedrich v. Sec'y Health & Human Servs.,* 894 F.2d 829, 837 (6th Cir. 1990). Here the administrative law judge did not and would not hear any arguments pertaining to the Federal Medicaid Act, and would only consider state regulations.

(Doc. 25, at 28).

This allegation about the administrative law judge's failure to "hear arguments pertaining to the Federal Medicaid Act" is not present in Plaintiffs' second amended complaint, and is therefore not properly raised as grounds to survive the current motion to dismiss.

Plaintiffs' second amended complaint also fails to allege facts that would support a claim based on equal protection. The Equal Protection Clause of the U.S. Constitution prohibits the state from denying to any person the equal protection of the laws. This is essentially a directive "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Accordingly, a claim based on the Equal Protection Clause must identify disparate treatment between similarly situated persons in order to be viable. Plaintiffs allege that the residents in this case "are among a class of persons who are elderly, disabled, and who require 24-hour skilled nursing facilities for their health, welfare, and survival." (Doc. 25, at 28). However, this alone is insufficient to support a claim under the Equal Protection Clause. Plaintiffs fail to allege any similarly situated person, or class separate from the residents, that was disproportionately favored by the state or given superior treatment.

Accordingly, Plaintiffs' claims related to due process and the Equal Protection Clause are without merit.

### F. Plaintiffs' § 1983 claim that Defendants violated the Federal Medicaid Act's medical assistance and nursery services mandate is without merit.

Count nine of Plaintiffs' second amended complaint states that "In violation of the medical assistance and nursing facility services provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(A), the Defendants, while acting under the color of law, have failed to provide the Plaintiffs with nursing facility services necessary for the health and welfare of these disabled Plaintiffs."  (Doc. 18, at 42).

42 U.S.C. § 1396a states that a state Medicaid plan must make "medical assistance" available to those persons eligible under the plan.  42 U.S.C. § 1396a(a)(10). "The term "medical assistance" means payment of part or all of the cost of the following care and services or the care and services themselves, or both . . . ." 42 U.S.C. § 1396d(a).  State Medicaid plans are additionally required to ensure that "such assistance shall be furnished with reasonable promptness to all eligible individuals[.]"  42 U.S.C. §1396a(a)(8).

Plaintiffs argue that Defendants have failed to meet both the "medical assistance" requirement and the "reasonable promptness" requirement imposed by federal Medicaid law.  However, Plaintiffs' filings reveal that the supposed deficiencies in Defendants' provision of services to the residents are entirely based on the incorrect assertion that Defendants' calculations of the residents' monthly patient liabilities is contrary to federal Medicaid law:

Plaintiffs have all alleged that Defendants have failed to properly provide full benefits to them and have adequately alleged due process violations under 42 U.S.C. § 1983 for violations of 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(A), and 1396a(a)(8). Plaintiffs are very clear in their complaint that Defendants have improperly calculated the patient liability share of each Plaintiff's obligation to submit their own income towards the cost of their care, and that they do not actually receive certain portions of said income, and therefore, there is a certain portion of services that Defendants continue to refuse to supply to Plaintiffs in violation of the Federal Medicaid Act. *See* Plaintiffs' Second Amended Complaint, Dkt. #18, ¶¶ 139-69.

(Doc. 25, at 34). As explained above, Ohio's state Medicaid plan, which requires the inclusion of the disputed funds in this case to be included in the residents' monthly patient liabilities, is not contradicted by federal Medicaid law. (*See supra* Part III.B). The alleged "deficiencies" in the care provided to the residents are therefore not deficiencies at all, but rather the state Medicaid plan working as intended.

Accordingly, Plaintiffs' claims regarding the Federal Medicaid Act's medical assistance requirement (Count nine of the second amended complaint) and the reasonable promptness requirement of the Federal Medicaid Act (Count ten of the second amended complaint) are without merit.

## IV. CONCLUSION

Accordingly, for the reasons stated above, Defendants' motion to dismiss (Doc. 23) is **GRANTED**. The Clerk shall enter judgment accordingly, whereupon this case shall be **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date:    3/2/18                                      *s/ Timothy S. Black*
                                                     Timothy S. Black
                                                     United States District Judge